**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

JASON D. PRIVLER,

                                 Plaintiff,                    1:18-cv-1020 (BKS/CFH)

v.

CSX TRANSPORTATION INC.,

                                 Defendant.

---

**Appearances:**

*For Plaintiff:*
Michael P. Hilferty
Vincent P. White
Maria Dinora Smith
White, Hilferty & Albanese P.C.
800 Third Avenue, Suite 2800
New York, NY 10022

*For Defendant:*
Susan C. Roney
Nixon Peabody LLP
40 Fountain Plaza, Suite 400
Buffalo, NY 14202

Andrew C. Rose
Nixon Peabody LLP
677 Broadway, 10th Floor
Albany, NY 12207

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.     INTRODUCTION

Plaintiff Jason D. Privler brings this action against Defendant CSX Transportation Inc.,

alleging claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), *as amended*, 42

U.S.C. § 2000e *et seq.*, for discrimination, retaliation and hostile work environment on account

of his Jewish race and/or religion[1]; claims under 42 U.S.C. § 1981 ("§ 1981") for racial discrimination and retaliation on account of his Jewish race; and claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 for discrimination, retaliation and hostile work environment on account of his perceived disability. (Dkt. No. 9). Defendant moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 59). Plaintiff has opposed the motion, (Dkt. No. 60), and Defendant has replied, (Dkt. No. 61). For the reasons set forth below, Defendant's motion for summary judgment is granted in part and denied in part.

## II.   FACTS[2]

### A.   Background on Defendant and the Utility Worker Position

Defendant is a Class I freight railroad that operates an extensive railroad network in the Eastern United States and Canada. (Dkt. No. 59-27, ¶ 1; Dkt. No. 60-3, ¶ 1). Defendant's Selkirk, New York railroad yard and related facilities (collectively, the "Selkirk Facility") are situated at the crossroads of the transportation of rail freight between the Eastern Great Lakes, Eastern Canada, New England, and the Atlantic coast. (Dkt. No. 59-27, ¶ 2; Dkt. No. 60-3, ¶ 2).

---

[1] Throughout Plaintiff's complaint, Plaintiff refers to his Jewish identity as a "race and/or religion," and he brings claims under both Title VII, which is applicable to both race-based and religion-based discrimination, and § 1981, which is applicable only to race-based discrimination. (*See generally* Dkt. No. 9); *see also Kampfer v. Buchanan*, No. 10-cv-1234, 2011 WL 691647, at *2, 2011 U.S. Dist. LEXIS 16586, at *6 (N.D.N.Y. Feb. 18, 2011) ("[W]hile the Second Circuit has held that discrimination based on alienage is also prohibited by section 1981, discrimination based on gender, religion, national origin, or age is not." (citing *Anderson v. Conboy*, 156 F.3d 167, 169-70 (2d Cir. 1998)). Similarly, the parties' summary judgment briefing consistently treats Plaintiff's claims as encompassing both race-based and religion-based discrimination claims. (*See generally* Dkt. Nos. 59-28, 60, 61). The Court construes Plaintiff's Title VII claims as alleging both race-based and religion-based discrimination.

[2] The facts are drawn from Defendant's statement of undisputed material facts pursuant to Local Rule 56.1 (formerly Local Rule 7.1(a)(3)), (Dkt. No. 59-27), to the extent those facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein to the extent they could "be presented in a form that would be admissible in evidence" at trial. Fed. R. Civ. P. 56(c)(2). In Plaintiff's response to Defendant's statement of material facts, Plaintiff conceded to each of Defendant's proffered facts, and did not submit his own counter-statement of material facts that he contends are not in dispute. (Dkt. No. 60-3). Plaintiff did, however, attach to his opposition brief several exhibits, (Dkt. No. 60-2), which the Court has considered to the extent they could be presented in a form that would be admissible in evidence at trial. The Court construes the facts in the light most favorable to Plaintiff. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

The Selkirk Facility is one of the busiest transportation hubs and freight switching facilities in Defendant's railroad network. (Dkt. No. 59-27, ¶ 3; Dkt. No. 60-3, ¶ 3). Defendant's workforce at the Selkirk Facility services locomotives and railcars and assembles trains in the railroad yard for dispatch to a large number of locations throughout the Eastern United States and Canada. (Dkt. No. 59-27, ¶ 4; Dkt. No. 60-3, ¶ 4). Defendant's locomotive shop at the Selkirk Facility services, maintains, and repairs arriving locomotives. (Dkt. No. 59-27, ¶ 5; Dkt. No. 60-3, ¶ 5). Utility workers at the Selkirk Facility assist the processing of locomotives in the locomotive shop and move locomotives into position to be joined with outgoing railcars. (Dkt. No. 59-27, ¶ 6; Dkt. No. 60-3, ¶ 6). The Selkirk Facility is a "24/7" operation in which trains are assembled and dispatched all hours of the day, seven days per week, and there is little significant difference in the volume of activity between weekdays and weekends. (Dkt. No. 59-27, ¶¶ 9-10; Dkt. No. 60-3, ¶¶ 9-10).

The job description for a utility worker at the Selkirk Facility indicates that such a worker's primary duties include cleaning, servicing and supplying locomotives; operating locomotives and heavy equipment; transporting supplies between storage and work sites; and providing support and clean-up services to locomotive and car repair areas. (Dkt. No. 59-27, ¶ 7; Dkt. No. 60-3, ¶ 7). The online job description and requirements of the utility worker position posted in 2016, when Plaintiff applied for the position, included an advisement that "[w]ork hours may include a nonstandard workweek, overtime, and various shift work," and the standard interview guides for interviewing prospective utility workers includes advisements about working nonstandard work weeks. (Dkt. No. 59-27, ¶¶ 11-12; Dkt. No. 60-3, ¶¶ 11-12).

Utility worker trainees at the Selkirk Facility attend a three-week preliminary training program at Defendant's facility in Atlanta, followed by a 12-week probationary period at the

Selkirk Facility, during which they rotate through various roles and learn their associated tasks such as moving locomotives in the locomotive shop and fuel plant, throwing switches, driving forklifts and janitorial duties. (Dkt. No. 59-27, ¶¶ 8, 50, 39-40, 54; Dkt. No. 60-3, ¶¶ 8, 39-40, 50, 54). At the end of this probationary period, if the Selkirk Facility's management team deems the trainee qualified, the trainee is permitted to take a test which, if passed, allows him to become a permanent utility worker. (Dkt. No. 59-27, ¶ 54; Dkt. No. 60-3, ¶ 54).

Defendant's labor force is unionized, and its various workers—carmen, trainmen, utility worker, electricians, machinists and so forth—are governed by collective bargaining agreements. (Dkt. No. 59-27, ¶ 13; Dkt. No. 60-3, ¶ 13). The utility workers at the Selkirk Facility are members of the National Conference of Firemen & Oilers, and their employment is governed by a collective bargaining agreement between Defendant and that union (the "CBA"). (Dkt. No. 59-27, ¶ 14; Dkt. No. 60-3, ¶ 14). Pursuant to the CBA, utility work at the Selkirk Facility is a seven-day-per-week position, and utility workers at the Selkirk Facility are required to work five days per week with two consecutive rest days, without a guarantee that those rest days will be on Saturdays and Sundays. (Dkt. No. 59-27, ¶¶ 15-16; Dkt. No. 60-3, ¶¶ 15-16). Each utility worker position has specified days off, and positions are assigned through a bidding system in which each position is awarded to the most senior employee who is qualified for, and bids on, the position. (Dkt. No. 59-27, ¶¶ 17-18; Dkt. No. 60-3, ¶¶ 17-18). Because utility worker positions that include weekend days off are considered the most desirable positions, these positions are typically filled by employees with the most seniority. (Dkt. No. 59-27, ¶ 19; Dkt. No. 60-3, ¶ 19). Newly-hired utility workers are only able to bid on available utility worker positions after they complete their probationary training period and pass their qualifying examination. (Dkt. No. 59-27, ¶¶ 54-55; Dkt. No. 60-3, ¶¶ 54-55).

Defendant has a Code of Ethics which prohibits discrimination and harassment based on, among other things, race, religion and physical or mental disability, and provides that:

> Any employee who has a complaint of workplace harassment against a supervisor, coworker, visitor or other person or believes he or she has been treated in an unlawful, discriminatory manner is expected to bring the problem to the company's attention.

(Dkt. No. 59-27, ¶¶ 21-22; Dkt. No. 60-3, ¶¶ 21-22). The Code of Ethics also provides information about a toll-free helpline and website through which employees can report "actual or suspected misconduct, questions, or concerns about . . . employment discrimination or harassment," and further advises that employees can "[c]ontact the Human Resources Business Partner for [their] department" to raise "Human Resources-related issues and concerns, including employment discrimination or harassment." (Dkt. No. 59-27, ¶ 23; Dkt. No. 60-3, ¶ 23). In addition to the Code of Ethics, Defendant has an Anti-Harassment Policy, which provides that employees with complaints of workplace harassment are "expected to bring the problem to the Company's attention" and "should immediately report the incident to [their] management supervisor, Human Resources Business Partner, or the CSX Ethics Information Toll Free Helpline." (Dkt. No. 59-27, ¶ 24; Dkt. No. 60-3, ¶ 24). The Anti-Harassment Policy also provides that retaliation against individuals who complain of harassment or discrimination is "strictly prohibited." (Dkt. No. 59-27, ¶ 24; Dkt. No. 60-3, ¶ 24). Finally, Defendant has an Equal Employment Opportunity Policy, which contains similar provisions barring discrimination, harassment and retaliation and again provides that aggrieved employees should immediately report violations to their Human Resources Manager or the toll-free ethics hotline. (Dkt. No. 59-27, ¶ 25; Dkt. No. 60-3, ¶ 25).

## B.     Plaintiff's Application and Initial Training Process

In October 2016, Plaintiff filled out an online job application for a utility worker position at the Selkirk Facility. (Dkt. No. 59-27, ¶ 29; Dkt. No. 60-3, ¶ 29). The online job posting for the

position, which Plaintiff reviewed prior to commencing his employment, included a job

description which advised that "[w]ork hours may include a nonstandard workweek, overtime,

and various shift work." (Dkt. No. 59-27, ¶¶ 11, 28; Dkt. No. 60-3, ¶¶ 11, 28). The online job

application that Plaintiff completed asked him to "select all of the conditions listed below in

which you are both willing and able to work," and Plaintiff provided affirmative responses to the

statements "[w]ork hours include on-call 7 days a week, 24 hours per day with extended periods

of time away from home," "[h]ours varying in length and schedule (may include a non-standard

work week, overtime, and various shifts)," and "[a]dhere to a strict absenteeism and discipline

policy." (Dkt. No. 59-27, ¶ 30; Dkt. No. 60-3, ¶ 30).

   In November 2016, after completing his application, Plaintiff attended an in-person

interview with Defendant's Selkirk Operations Manager, Derrick Gibson, and two other

interviewers. (Dkt. No. 59-27, ¶ 31; Dkt. No. 60-3, ¶ 31). At that interview, Plaintiff was

informed about Defendant's seniority-based system for scheduling days off, and Gibson told

Plaintiff that he should not expect to have weekend days or major holidays off for many years.

(Dkt. No. 59-27, ¶¶ 20, 32, 35; Dkt. No. 60-3, ¶¶ 20, 32, 35). According to Plaintiff's deposition

testimony and a record of his interview with an investigator from the New York State

Department of Human Rights ("NYSDHR"), he believed that Gibson's statements were meant to

identify religious individuals who might ask for days off for religious reasons on particular days,

including Jewish people whose religion prevents them from working on Saturdays. (Dkt. No. 59-

7 at 12-14; Dkt. No. 59-11, at 2). Plaintiff did not respond or react to Gibson's statements, and

told Gibson that he had past experience working in an environment with a non-standard work

week (including a 24/7 work week, overtime and shift work) and would be cooperative with

respect to scheduling. (Dkt. No. 59-27, ¶¶ 32-34; Dkt. No. 60-3, ¶¶ 32-34).[3] Plaintiff's religion was not discussed during his interview. (Dkt. No. 59-27, ¶ 36; Dkt. No. 60-3, ¶ 36). Plaintiff did not think that Gibson knew he was Jewish at the time of his interview and did not believe Gibson knew his creed at the time of hire. (Dkt. No. 59-27, ¶ 37; Dkt. No. 60-3, ¶ 37).

Beginning on January 16, 2017, Plaintiff was employed by Defendant as a utility worker trainee. (Dkt. No. 59-27, ¶ 38; Dkt. No. 60-3, ¶ 38). Plaintiff's employment began with a three-week training session at Defendant's training facility in Atlanta, during which Plaintiff participated in a range of training programs applicable to utility workers, such as mechanical locomotive core, locomotive movement, railroad safety, and others. (Dkt. No. 59-27, ¶¶ 39-40; Dkt. No. 60-3, ¶¶ 39-40). During his training period in Atlanta, Plaintiff asked two trainers about the possibility of having "every Saturday off" for religious purposes after he began working at the Selkirk Facility. (Dkt. No. 59-27, ¶ 46; Dkt. No. 60-3, ¶ 46). Both trainers advised him to discuss that issue with the management team at the Selkirk Facility upon his return. (Dkt. No. 59-27, ¶ 46; Dkt. No. 60-3, ¶ 46). Plaintiff told his NYSDHR investigator that he also "was told not to make waves during his 12-week probationary period" at Selkirk. (Dkt. No. 59-11, at 3). Plaintiff did not expect either Atlanta trainer to relay his query about Saturdays off to anyone at the Selkirk Facility, and does not know whether either trainer did so. (Dkt. No. 59-27, ¶ 47; Dkt. No. 60-3, ¶ 47; Dkt. No. 59-11, at 3). Plaintiff told his NYSDHR interviewer that he was "at the top of his class in Atlanta," that he assisted another trainee in passing his examinations, and that he had obtained recommendation letters from his Atlanta instructors, (Dkt. No. 59-11, at 3), but

---

[3] Plaintiff held two jobs prior to applying for employment at Defendant's Selkirk Facility. Between 1998 and 2014 (from the ages of 18 to 34), Plaintiff worked in the bakery department at Price Chopper supermarkets, during which he sometimes worked on Saturdays and Sundays. (Dkt. No. 59-27, ¶ 26; Dkt. No. 60-3, ¶ 26). From 2014 to late 2016, Plaintiff worked as a longshoreman at Federal Marine Terminals in Albany, during which he also sometimes worked on Saturdays and Sundays. (Dkt. No. 59-27, ¶ 27; Dkt. No. 60-3, ¶ 27).

neither party has submitted these recommendation letters or any other corroborating evidence as part of the record.

### C.   Harassment at the Selkirk Facility

Plaintiff began his 12-week probationary period at the Selkirk Facility on February 6, 2017. (Dkt. No. 59-27, ¶ 48; Dkt. No. 60-3, ¶ 48). On his first day, he was given a four-to-eight-hour safety briefing by the Selkirk Facility's Safety Coordinator, Richard Losee. (Dkt. No. 59-27, ¶ 48; Dkt. No. 60-3, ¶ 48). He was then sent to the Selkirk Facility's Training Coordinator, John Goca, who was responsible for setting up the training schedule, assigning Plaintiff and other trainees to accompany various other utility worker trainers through the various jobs and tasks required of a utility worker, and adjusting the training schedule as necessary to ensure that trainees understood each position and task before being rotated to another. (Dkt. No. 59-27, ¶¶ 48, 51; Dkt. No. 60-3, ¶¶ 48, 51). Both Goca and Losee were unionized utility workers; neither were part of the Selkirk Facility's management team, and neither had supervisory responsibilities over Plaintiff. (Dkt. No. 59-27, ¶¶ 52, 113, 132-33; Dkt. No. 60-3, ¶¶ 52, 113, 132-33). During his probationary period, Plaintiff was trained by peer trainers, who were all unionized utility workers and were not part of the Selkirk Facility's management team. (Dkt. No. 59-27, ¶ 53; Dkt. No. 60-3, ¶ 53).

Approximately one month into Plaintiff's probationary period, a machinist named Brian (last name unknown) began calling him by the nickname "Sling Blade," apparently because he felt that Plaintiff resembled the lead character in the movie of that name. (Dkt. No. 59-27, ¶ 76; Dkt. No. 60-3, ¶ 76). Other employees—including fellow utility workers Kenneth Iaonne and Tim Anderson, peer trainer Drew Hanley, and others whose names Plaintiff did not know—soon began referring to Plaintiff as "Sling Blade" in his presence, and making grunting noises resembling those of the lead character in the movie. (Dkt. No. 59-27, ¶¶ 77-80; Dkt. No. 60-3, ¶¶

77-80). According to deposition testimony from Losee and Goca, the giving out of nicknames among utility workers at the Selkirk Facility was not uncommon, and Goca understood that the reason Plaintiff was given the nickname "Sling Blade" was because of his physical resemblance to the movie character. (Dkt. No. 59-27, ¶¶ 82, 84; Dkt. No. 60-3, ¶¶ 82, 84). While Plaintiff did not mind the nickname at first, he started to take offense to it after learning that the namesake character is a mentally disabled murderer. (Dkt. No. 59-27, ¶¶ 85-86; Dkt. No. 60-3, ¶¶ 85-86).

Plaintiff claims that he experienced other specific instances of harassment by particular employees. On various occasions, Iaonne asked him if he was an axe murderer or serial killer, told him he looked like a pedophile, and asked him how many missing children there were in his neighborhood. (Dkt. No. 59-27, ¶¶ 92-95; Dkt. No. 60-3, ¶¶ 92-95). The two occasions on which Iaonne asked Plaintiff about missing children in his neighborhood occurred during the Jewish Passover holiday, though Plaintiff acknowledged that he did not know whether Iaonne knew it was Passover or that Plaintiff was Jewish. (Dkt. No. 59-27, ¶ 96; Dkt. No. 60-3, ¶ 96). On various occasions, Anderson asked Plaintiff if he was an axe murderer, how many dead bodies he carried in the back of his car, and whether he was a "cockbuffer"; Plaintiff does not know the motivation behind these questions or remarks. (Dkt. No. 59-27, ¶¶ 92, 97-100; Dkt. No. 60-3, ¶¶ 92, 97-100). Fellow utility worker Will Campney also allegedly harassed Plaintiff on numerous occasions, including telling him that "mother Nature has a way of fixing its problems" after learning that Plaintiff and his trainer had apparently crossed a track in front of a moving locomotive; telling a lunchroom full of fellow utility workers that he would have no problem running over somebody with a locomotive while staring directly at Plaintiff; throwing Plaintiff's lunch in the trash while cleaning, and telling Plaintiff that he took pride in doing so; and

generally making it apparent to Plaintiff that he did not like working with him. (Dkt. No. 59-27, ¶¶ 101-05; Dkt. No. 60-3, ¶¶ 101-05).

According to his deposition testimony and statements during his interview with the NYSDHR investigator, Plaintiff does not know the motivation behind the aforementioned harassment, but suspects it to be based in antisemitism due to his understanding that, historically, antisemites have smeared Jewish people as mentally disabled and murderers. (Dkt. No. 59-27, ¶¶ 83, 89, 91; Dkt. No. 60-3, ¶¶ 83, 89, 91). Plaintiff specifically noted that Iaonne's questions during the Passover holiday about missing children in Plaintiff's neighborhood invoked the concept of "blood libel," an antisemitic canard originating in the Middle Ages in which Jews have been falsely accused of kidnapping and murdering children for ritual purposes during Passover. (Dkt. No. 59-27, ¶ 96; Dkt. No. 60-3, ¶ 96). However, Plaintiff testified that he does not know whether others at the Selkirk Facility, including those engaged in the harassment he complained of, were aware that he was Jewish. (Dkt. No. 59-27, ¶¶ 90, 96; Dkt. No. 60-3, ¶¶ 90, 96). Plaintiff also alleges that the foregoing harassment constitutes discrimination on account of perceived disability under the ADA, though he acknowledges that he has no mental disabilities and is unaware whether of Defendant's employees at the Selkirk Facility perceived him as being disabled. (Dkt. No. 59-27, ¶¶ 87-88; Dkt. No. 60-3, ¶¶ 87-88).

Plaintiff testified that he complained to the following individuals about receiving unwanted comments from co-workers: his peer trainer Ray McClaussin, someone named Ed (last name unknown) whose position Plaintiff could not identify, Richard Losee, fellow utility worker Jimmy Selkirk, fellow trainee Julio Ocasio, and his peer trainer Chuck (last name unknown). (Dkt. No. 59-27, ¶¶ 107-16; Dkt. No. 60-3, ¶¶ 107-16). Plaintiff testified that, when he complained to Losee about the harassment he was experiencing, Losee told him that the

harassing behavior was a normal part of the railroad environment and that he should accept it or risk it getting worse; for his part, Losee denies that Plaintiff ever complained to him regarding the harassment. (Dkt. No. 59-27, ¶¶ 111-12; Dkt. No. 60-3, ¶¶ 111-12; Dkt. No. 59-7, at 31). Plaintiff did not recall reporting unwanted harassment to any other individuals (including Gibson or anyone else on the Selkirk Facility's management team), and did not report the harassment to Defendant's ethics helpline. (Dkt. No. 59-27, ¶¶ 117-20; Dkt. No. 60-3, ¶¶ 117-20).

### D.   Plaintiff's Inquiries Regarding Religious Accommodations at the Selkirk Facility

According to Plaintiff, in January 2017, he asked Gibson "something to the effect of what the possibility was for procuring . . . Saturdays off for religious observance" and "informed Gibson, that after his twelve (12) weeks training, he would need to request a reasonable accommodation for his religious observance during the weekends, particularly on Saturdays," to which Gibson responded that others who have worked much longer still have not had a weekend day off. (Dkt. No. 9, at 6; Dkt. No. 59-19, at 16; Dkt. No. 59-27, ¶¶ 128-29; Dkt. No. 60-3, ¶¶ 128-29). Plaintiff asserts that in late April 2017, he told Goca that he intended to request Saturdays off for religious purposes after he became qualified as a full-time utility worker. (Dkt. No. 59-27, ¶¶ 124-25; Dkt. No. 60-3, ¶¶ 124-25). According to Plaintiff, Goca responded that "[w]e have people around here who have been working for five to ten years without a weekend day off," and that "[y]ou might get stuck working weekends for five to ten years." (Dkt. No. 59-27, ¶ 126; Dkt. No. 60-3, ¶ 126). Goca denies that Plaintiff ever requested a weekend off or indicated that he would be asking for a religious accommodation. (Dkt. No. 59-27, ¶ 127; Dkt. No. 60-3, ¶ 127).

Plaintiff never made a formal request for a religious accommodation during his time at the Selkirk Facility, as his understanding was that he could only do so after he completed his

probationary period and became qualified as a full-time utility worker able to bid on jobs. (Dkt. No. 59-27, ¶¶ 122-23; Dkt. No. 60-3, ¶¶ 122-23). Plaintiff told his NYSDHR investigator that he "felt like he couldn't ask [for a formal religious accommodation] until after his qualification period because he had been told not to make waves" when he raised the subject during his training in Atlanta. (Dkt. No. 59-11, at 3).

E.     **Other Incidents**

Plaintiff's training at the Selkirk Facility included discussions of Defendant's strict absenteeism policy, and trainees were told that there would be no tolerance for absenteeism or tardiness. (Dkt. No. 59-27, ¶¶ 56-57; Dkt. No. 60-3, ¶¶ 56-57). On February 9, 2017, Plaintiff was two hours late to work due to an accident in which his car ended up in a ditch during a snowstorm. (Dkt. No. 59-27, ¶ 58; Dkt. No. 60-3, ¶ 58). Plaintiff testified that, the following day, Gibson summoned him to his office and told him "in very harsh words" that one cannot be late for work, in a tone that Plaintiff took offense to. (Dkt. No. 59-27, ¶ 59; Dkt. No. 60-3, ¶ 59). Plaintiff testified that, during his time at the Selkirk Facility, several other employees had issues with absenteeism or tardiness, and that he believes they were not reprimanded as harshly as he was; in general, Plaintiff does not know what Gibson told such employees about their tardiness or absence, though he did specifically recall that one his fellow trainee, Julio Ocasio, told him he did not receive any sort of reprimand after missing work due to a snowstorm. (Dkt. No. 59-27, ¶ 60; Dkt. No. 60-3, ¶ 60; Dkt. No. 59-7, at 22-23). Defendant's records and Goca's testimony reflect that, on one other occasion, Plaintiff was absent from work on a scheduled day without excuse, though Plaintiff himself did not recall this incident. (Dkt. No. 59-27, ¶¶ 67-69; Dkt. No. 60-3, ¶¶ 67-69).

On one occasion during Plaintiff's first or second week of training at the Selkirk Facility, Plant Superintendent/Facilities Coordinator Serge Emelkin reprimanded Plaintiff in front of other

employees for having untied bootlaces. (Dkt. No. 59-27, ¶¶ 61-62; Dkt. No. 60-3, ¶¶ 61-62).
Plaintiff took offense at being reprimanded in front of other employees and felt that Emelkin's
behavior was inappropriate; he did not know whether Emelkin's actions were related to
Plaintiff's Jewish religion, but he testified that he did not observe Emelkin reprimanding any
other employees in this way. (Dkt. No. 59-27, ¶ 63; Dkt. No. 60-3, ¶ 63; Dkt. No. 59-7, at 42).
Plaintiff also testified about another incident where a manager, Robert Patterson, discovered him
and his peer trainer, Drew Hanley, conversing in an engine, and yelled at them both for idling.
(Dkt. No. 59-27, ¶ 65; Dkt. No. 60-3, ¶ 65). Plaintiff took issue with the fact that Patterson
reprimanded them both, as he believed that, as Plaintiff was only a trainee and Hanley was his
trainer, Hanley alone should have been held accountable. (Dkt. No. 59-27, ¶ 65; Dkt. No. 60-3, ¶
65). Plaintiff does not know whether Patterson knew he was Jewish. (Dkt. No. 59-7, at 41).

    Plaintiff testified that, during a large group meeting in March 2017, Plaintiff asked
Emelkin a question about his employment status in light of rumored possible job cuts at
Defendant's facilities due to a new CEO, and Emelkin responded by asking Plaintiff in a
mocking way whether he had any intentions of working there, causing others to laugh. (Dkt. No.
59-27, ¶ 143; Dkt. No. 60-3, ¶ 143). Plaintiff does not know the reason why Emelkin answered
his question the way he did, but testified that he felt that Emelkin's retort made "a complete
mockery" of him and was intended to humiliate him. (Dkt. No. 59-27, ¶¶ 144-45; Dkt. No. 60-3,
¶¶ 144-45).

### F.    Defendant's Decision Not to Qualify Plaintiff for Permanent Employment

    During trainees' probationary period at the Selkirk Facility, managers gathered
information about their progress from direct observation and from receiving feedback from the
trainees' peer trainers (who, as noted, were all unionized utility workers); the managers then
ultimately made the decision as to whether to qualify the trainees for permanent positions. (Dkt.

No. 59-27, ¶¶ 131, 134; Dkt. No. 60-3, ¶¶ 131, 134). Neither John Goca nor Richard Losee were

members of the management team, and neither played a role in the decision of whether to qualify

Plaintiff. (Dkt. No. 59-27, ¶¶ 132-33; Dkt. No. 60-3, ¶¶ 132-33).

Goca testified that, during Plaintiff's probationary period, he received feedback on

Plaintiff's progress that was positive "[f]or the most part," that Plaintiff was "a good worker"

who never refused direction, and that he was the type to be attentive to his job, but that "the

feedback that [Goca] was getting from most of the peer trainers" was that Plaintiff "wasn't a

good fit." (Dkt. No. 59-4, at 12-13). On April 25, 2017, Shift Plant Superintendent Tommy

Hughes sent an email to Gibson reporting that "in the few days that [Plaintiff] has been a trainee

on my shift I can easily say that I am not impressed with his motivation and overall ability to

grasp the job at hand." (Dkt. No. 59-27, ¶ 75; Dkt. No. 60-3, ¶ 75). Gibson then forwarded the

email to other individuals on the Selkirk Facility's management team and solicited further

feedback. (Dkt. No. 59-27, ¶ 130; Dkt. No. 60-3, ¶ 130).

In an affidavit submitted in support of Defendant's summary judgment motion, Matthew

Charron, Defendant's Senior Manager of Employee Relations, describes his review of

Defendant's internal records regarding Plaintiff's employment. These records included interview

notes of Serge Emelkin, Derrick Gibson, and Robert Patterson, who were Plant Superintendent,

Assistant Plant Superintendent and Shift Plant Superintendent, respectively, at the time of

Plaintiff's training. (Dkt. No. 59-25, ¶ 22). These records reflect that the Selkirk Facility's

management team "noticed that [Plaintiff] showed a lack of comprehension of what the job

entailed," and "had a hard time grasping concepts like where he was supposed to be when

locomotives moved through the facility"; "received reports from [Plaintiff's] trainers about him

not being a safe employee"; "was aware of at least one occasion where [Plaintiff] walked across

14

a track with a moving locomotive, presenting a substantial safety concern"; and "noticed that [Plaintiff's] attitude towards learning the job was substandard, as reflected in the way he communicated and walked, and he appeared to lack a sense of urgency." (Dkt. No. 59-27, ¶¶ 70-74; Dkt. No. 60-3, ¶¶ 70-74).

Plaintiff has maintained that he never received such negative feedback from his peer trainers or others at the Selkirk Facility during his probationary period. (Dkt. No. 59-11, at 5-6). He also testified that, during his training, Goca reassured him that he was "not going to pick up everything during the 12 weeks during the training period," and that some aspects of the job take "years of experience to fully pick up." (Dkt. No. 59-7, at 46). Plaintiff also testified that, on "several different occasions" toward the end of his probationary period, a peer trainer, Raymond McClaussin told him that Defendant's "management had the intent on being markedly or much harder on [Plaintiff], in terms of treatment of the upcoming qualification, than would be applied to" his fellow trainee Julio, and when Plaintiff asked him why, he merely smirked and did not answer. (*Id.* at 47-48).

On April 26, 2017, Defendant terminated Plaintiff's probationary period and rejected his application for permanent employment. (Dkt. No. 59-27, ¶¶ 137-38; Dkt. No. 60-3, ¶¶ 137-38). According to Plaintiff's account of events, in a follow-up phone call, Goca stated that "he had no idea why [Plaintiff] was being terminated" and that "[i]t was a total shock," that Plaintiff "was not a good fit," that "the managers had gotten together and stated that [Plaintiff] lacked motivation and interest in the job," and that the Selkirk Facility "was not a fair place" and "certain people just didn't belong." (Dkt. No. 59-11, at 5). In his deposition, Goca testified that he was not aware of the reasons why Plaintiff was deemed unqualified since he was not involved in that decision, but that he was informed Plaintiff "was not a good fit," meaning "he's not cut

out for the job," and that he understood that the decision was related to Plaintiff's job performance. (Dkt. No. 59-4, at 15).

Defendant maintains that none of the individuals involved in the decision not to qualify Plaintiff knew that he is Jewish. (Dkt. No. 59-27, ¶ 139; Dkt. No. 60-3, ¶ 139). Plaintiff, however, believes that Gibson learned he was Jewish after he expressed his intention to request a religious accommodation.[4] Plaintiff also noted in his interview with his NYSDHR investigator that his application for permanent employment was rejected several days after he expressed his intention to request a religious accommodation to Goca in late April 2017. (Dkt. No. 59-11, at 3). Plaintiff has since returned to his previous job as a longshoreman at Federal Marine Terminals in Albany, during which he has worked some Saturdays and Sundays. (Dkt. No. 59-27, ¶ 140; Dkt. No. 60-3, ¶ 140).

Goca testified that, in his capacity as secretary for the utility workers' union, he received formal notice each time a trainee at the Selkirk Facility was deemed not qualified and was not offered a permanent position, and that during his six to eight years as union secretary, this happened four to six times, in each case because the trainee did not "grasp the job" or "make the grade." (Dkt. No. 59-27, ¶ 151; Dkt. No. 60-3, ¶ 151). According to records Defendant submitted in response to a NYSDHR query, between January 1, 2016 and April 26, 2017, only two utility worker trainees failed to qualify after their probationary period: one on December 27, 2016, and one (which appears to be Plaintiff) on April 25, 2017. (Dkt. No. 59-22, at 12).

---

[4] Plaintiff asserts, in conclusory fashion, that Gibson could have inferred Plaintiff's Jewish heritage based on his last name and the fact that he has family in Israel. (Dkt. No. 59-7, at 37; Dkt. No. 59-11, at 4). Plaintiff claims that Gibson could have learned information that would have revealed Plaintiff's Judaism through a simple online search, (Dkt. No. 59-7, at 37; Dkt. No. 59-11, at 4), but provides no support for this assertion.

### G.    Post-Termination Procedural History

On or about October 6, 2017, Plaintiff filed a complaint (the "EEOC Complaint") with the NYSDHR alleging workplace discrimination and harassment based on his Jewish faith, which he dually filed with the U.S. Equal Employment Opportunity Commission (the "EEOC"). (Dkt. No. 59-27, ¶¶ 141-42; Dkt. No. 60-3, ¶¶ 141-42). In response to Plaintiff's filing, the EEOC composed a charge form, which was sent to Defendant on or about October 11, 2017. (Dkt. No. 59-27, ¶ 142; Dkt. No. 60-3, ¶ 142). Neither the EEOC complaint nor the charge form indicated that Plaintiff was alleging discrimination based on disability or perceived disability under the ADA. (Dkt. No. 59-27, ¶¶ 141-42; Dkt. No. 60-3, ¶¶ 141-42). The NYSDHR investigated Plaintiff's complaint and issued a Final Investigation Report and Basis of Determination dated April 4, 2018, in which it found no probable cause to support Plaintiff's allegations. (Dkt. No. 59-27, ¶¶ 147-48; Dkt. No. 60-3, ¶¶ 147-48). The Final Investigation Report and Basis of Determination did not indicate that discrimination based on disability or perceived disability was alleged by Plaintiff or investigated by the NYSDHR. (Dkt. No. 59-27, ¶ 147; Dkt. No. 60-3, ¶ 147). On May 22, 2018, the EEOC adopted the findings and determination of the NYSDHR, dismissed Plaintiff's charge and closed his file. (Dkt. No. 59-27, ¶ 149; Dkt. No. 60-3, ¶ 149).

### III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of

the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact

where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting

*Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

IV.    **DISCUSSION**

    A.    **Disability Discrimination Claims (Sixth, Seventh and Eighth Causes of Action)**

Plaintiff brings claims for discrimination (Sixth Cause of Action), hostile work

environment (Seventh Cause of Action), and retaliation (Eighth Cause of Action) under the

ADA. (Dkt. No. 9, at 17-20). Plaintiff concedes that he "does not consider himself disabled," but

contends that he is disabled within the meaning of the ADA "based upon [D]efendant[']s

perception and treatment of [him] as a disabled person." (*Id.* at 4); *see also* 42 U.S.C. §

12102(1)(C) (defining "disability" for purposes of the ADA to include "being regarded as

having" a disability). Defendant seeks dismissal of all of Plaintiff's ADA claims on the grounds

that he did not include them in his EEOC Complaint and therefore failed to exhaust his

administrative remedies with respect to them. (Dkt. No. 59-28, at 16-17; Dkt. No. 61, at 8).

Plaintiff argues that his ADA claims are "reasonably related" to the claims asserted in his EEOC

Complaint, and therefore should survive dismissal on exhaustion grounds. (Dkt. No. 60, at 9-10).

Before bringing a claim under Title VII, a plaintiff must exhaust her administrative

remedies by filing a charge with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1), (f)(1); *Fort Bend*

*Cty., Texas v. Davis*, 139 S. Ct. 1843, 1846 (2019). That same exhaustion requirement applies to

employment discrimination claims brought under the ADA. *See, e.g., Soules v. Conn. Dep't of*

*Emergency Servs. & Pub. Prot.*, 882 F.3d 52, 56-57 (2d Cir. 2018); *Hoffman v. Williamsville*

*School Dist.*, 443 F. App'x. 647, 649 (2d Cir. 2011). The exhaustion requirement is not

jurisdictional; instead, it is "properly ranked among the array of claim-processing rules that must

be timely raised to come into play."[5] *Fort Bend*, 139 S. Ct. at 1846; *see also id.* at 1850-52.

Although a plaintiff may not pursue an unexhausted claim, courts may "consider all claims to the

extent they are 'reasonably related' to those" the plaintiff asserted in a timely EEOC charge.

*Mathirampuzha v. Potter*, 548 F.3d 70, 75 (2d Cir. 2008).

A claim is reasonably related to allegations in an EEOC charge if "the conduct

complained of would fall within the scope of the EEOC investigation which can reasonably be

expected to grow out of the charge of discrimination." *Id.* at 76 (quoting *Terry v. Ashcroft*, 336

F.3d 128, 151 (2d Cir. 2003)). In making this determination, courts must focus "on the factual

allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which

a plaintiff is grieving." *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (quoting *Freeman v.

Oakland Unified Sch. Dist.*, 291 F.3d 632, 637 (9th Cir. 2002)). Because it is the "substance of

the charge and not its label that controls," *Alonzo v. Chase Manhattan Bank, N.A.*, 25 F. Supp. 2d

455, 458 (S.D.N.Y. 1998), where a plaintiff later asserts an additional basis for discrimination,

"[t]he central question is whether the complaint filed with the EEOC gave that agency 'adequate

notice to investigate discrimination on both bases,'" *Williams v. New York City Hous. Auth.*, 458

F.3d 67, 70 (2d Cir. 2006) (quoting *Deravin*, 335 F.3d at 202).[6]

---

[5] Because failure to exhaust is an affirmative defense, *Belgrave v. Pena*, 254 F.3d 384, 386 (2d Cir. 2001), it is properly interposed in an answer to a complaint, *see* Fed. R. Civ. P. 8(c); *Canty v. Wackenhut Corr. Corp.*, 255 F. Supp. 2d 113, 117 (E.D.N.Y. 2003) (finding that the defendant had not waived its exhaustion defense because it had raised it in its answer). Here, Defendant timely raised the exhaustion defense in its answer. (Dkt. No. 18, at 20).

[6] Additionally, a claim is reasonably related to conduct described in an EEOC charge if the claim concerns "retaliation for filing the EEOC charge" or "further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002) (quoting *Butts v. N.Y.C. Dep't of Hous. Preservation and Dev.*, 990 F.2d 1397, 1402-03 (2d Cir. 1993)). These additional prongs of the "reasonably related" test are not relevant to Plaintiff's claims, however, as he did not file his EEOC Complaint until after his employment relationship with Defendant was severed, and his claims are not based on any conduct that occurred after the EEOC Complaint was filed.

Here, Plaintiff's EEOC Complaint was based entirely on his contention that Defendant and its employees discriminated against him because he is Jewish. (Dkt. No. 59-20, at 2-7). The EEOC Complaint nowhere alleges, explicitly or implicitly, that Plaintiff is disabled, or that Defendant or any of its employees perceived him as such. (*Id.*). While the EEOC Complaint includes allegations that Plaintiff was given the nickname "Sling Blade," harassed with grunting noises and gestures similar to those made by the namesake movie character, and called other derogatory names like "child molester," "serial killer," "pedophile" and "axe murderer," the EEOC Complaint identifies Plaintiff's Jewish religion, and not any actual or perceived mental disability, as the cause of this mistreatment. (*Id.* at 4). Notably, the EEOC Complaint does not include any allegations that the "Sling Blade" character's mental disability was part of the reason Plaintiff received that nickname, or that his colleagues harassed him with derogatory language that might hint at their belief that he had a mental disability.

In his subsequent interview with his NYSDHR investigator, Plaintiff did point out that the "Sling Blade" character was "considered retarded," but this was in the context of asserting that antisemites have historically smeared Jewish people as "retarded" murderers, in order to clarify why he found the nickname "Sling Blade" to be antisemitic. (Dkt. No. 59-11, at 4). The notes nowhere suggest that, at any point during the interview, he complained that Defendant or its employees were discriminating against, harassing or retaliating against him because they actually perceived him to have a mental disability. (*Id.* at 2-7). Moreover, the Notice of Charge prepared by the EEOC and all the materials from the NYSDHR investigation that are in the record clearly show that the investigation was limited to Plaintiff's allegations of discrimination on account of his Jewish identity, and that neither agency considered or investigated actual or

perceived disability discrimination. (Dkt. No. 59-17, at 2-9; Dkt. No. 59-22, at 2-4; Dkt. No. 59-24, at 2; Dkt. No. 59-25, at 2-7).

As such, the Court finds that "there is nothing in the [EEOC Complaint] that would have given the EEOC or the NYSDHR reason to investigate disability discrimination related to [Plaintiff's] mental disability or perceived mental disability," and that the ADA claims he now brings are therefore not "reasonably related" to the creed discrimination claims in the EEOC Complaint. *Agosta v. Suffolk Cty.*, 981 F. Supp. 2d 167, 172-74 (E.D.N.Y. 2013) (finding that the plaintiff's unexhausted disability discrimination claims were not "reasonably related" to the sex and sexual orientation discrimination claims included in his EEOC charge, where "the EEOC Charge does not even mention that the Plaintiff has a mental disability or perceived mental disability, and therefore, the EEOC and NYSDHR would have no way of knowing that this was a potential basis for the alleged discriminatory conduct"); *see also Harris v. Am. Prot. Servs. Of New York, Inc.*, 1 F. Supp. 2d 191, 195 (W.D.N.Y. 1998) (noting that the plaintiff's "race and disability discrimination claims are wholly different types of discrimination than the claim of disparate treatment sex discrimination [the plaintiff]] alleged in his EEOC charge," observing that "[c]ourts will not permit a claim that is based on a wholly different type of discrimination to be brought if it was not initially asserted in the EEOC charge," and collecting supporting case law (quoting *Peterson v. Ins. Co. of N. Am.*, 884 F. Supp. 107, 109 (S.D.N.Y. 1995))).

Therefore, Plaintiff has failed to exhaust his administrative remedies with respect to the Sixth, Seventh and Eighth Causes of Action in his complaint, and Defendant is entitled to summary judgment dismissing these causes of action on exhaustion grounds. Because the Court finds that Plaintiff's ADA claims must be dismissed on exhaustion grounds, the Court need not reach the merits of those claims.

B.      **Hostile Work Environment Claim (Third Cause of Action)**

Plaintiff brings a hostile work environment claim under Title VII, alleging that he experienced a pattern of severe and pervasive workplace harassment on account of his Jewish identity (Third Cause of Action). (Dkt. No. 9, at 15). To establish a hostile work environment claim under Title VII, a plaintiff must demonstrate harassment on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). The hostile work environment standard includes "both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). "To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) (quoting *Alfano*, 294 F.3d at 374). Thus, the factors courts consider in evaluating whether a hostile work environment exists include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "To survive summary judgment on a hostile work environment claim, a plaintiff must first show 'either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [the plaintiff's] working environment.'" *Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) *aff'd*, 629 F.3d 276 (2d Cir. 2010) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (internal punctuation omitted)).

Defendant argues that Plaintiff's hostile work environment claim must be dismissed because: (1) Plaintiff cannot show that the harassment he allegedly experienced at the Selkirk Facility was on account of his Jewish identity; (2) the harassment was not sufficiently severe or pervasive to alter the conditions of his employment; and (3) there is no basis to impute the alleged harassment to Defendant, since the harassment was carried out by individuals without power to take tangible employment actions against Plaintiff, Defendant's management team was unaware of the harassment, and Plaintiff failed to report the harassment through the channels Defendant provided. (Dkt. No. 59-28, at 23-29; Dkt. No. 61, at 7-8). Plaintiff contests each of these arguments. (Dkt. No. 60, at 16-19).

Construing the record in the light most favorable to Plaintiff, Plaintiff has described obnoxious, repeated harassment he experienced from various employees at the Selkirk Facility, including: being assigned the nickname "Sling Blade," in reference to a movie about a mentally disabled axe murderer; being frequently grunted at in a way that resembled the noises made by the lead character in that movie; being called an "axe murderer," "pedophile" and "serial killer"; being asked how many missing children there were in his neighborhood and how many dead bodies he carried in the back of his car; being subjected to bullying, offensive and, at times, threatening behavior by utility worker Will Campney; and receiving a mocking response from a supervisor after asking a question about his future employment in a large group setting. (Dkt. No. 59-27, ¶¶ 76-80, 92-105, 143-45; Dkt. No. 60-3, ¶¶ 76-80, 92-105, 143-45).[7] However, even

____

[7] In addition to the foregoing, Plaintiff complains of several other events at the Selkirk Facility that he characterizes as harassment, including being harshly reprimanded by Gibson for being two hours late to work during a snowstorm, being criticized in front of other employees for having untied bootlaces, and being yelled at by a manager for idling in a cab with a peer trainer. (Dkt. No. 59-27, ¶¶ 58-66; Dkt. No. 60-3, ¶¶ 58-66). Plaintiff appears to believe that he was treated more harshly than other, non-Jewish employees for similar infractions, but offers no concrete evidence of this beyond his own speculation, and admits that he does not know whether the supervisors involved even knew of his religious background. (Dkt. No. 59-27, ¶¶ 60, 63, 66, 90; Dkt. No. 60-3, ¶¶ 60, 63, 66, 90; Dkt. No. 59-7, at 22-23, 40-42). In the absence of any non-speculative indicia that these incidents were tied to Plaintiff's Jewish identity, that Plaintiff was criticized more harshly than non-Jewish individuals for the same behavior, or that these incidents

assuming that a reasonable fact-finder could find that this harassment was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment, there is no evidence in the record from which the fact-finder could conclude that the harassment was tied to his Jewish identity. Plaintiff has produced no evidence—or indeed, even seriously contended—that any of the individuals who harassed him were aware that he was Jewish. And, on their face, the harassing statements and actions do not have antisemitic overtones that could imply hostility toward Plaintiff's Jewish religion. *See, e.g., Gong v. City Univ. of New York*, 846 F. App'x 6, 9 (2d Cir. 2021) (affirming dismissal of hostile work environment claim where "many of the alleged incidents lack any racial overtone"). To the contrary, the record suggests that at least some of the harassment Plaintiff experienced was tied to his physical resemblance to the non-Jewish lead character in the movie "Sling Blade." (Dkt. No. 59-27, ¶¶ 76, 82; Dkt. No. 60-3, ¶¶ 76, 82). As to the rest, while the record is silent on why some employees held such open hostility and dislike toward Plaintiff, there is no evidence that would allow a reasonable fact-finder to conclude that Plaintiff's Jewish identity was even part of the reason for their feelings toward him.

Plaintiff's attempt to tie the hostility he experienced to his Jewish identity rests largely on his own belief that some of his harassers' actions are consistent with a historical pattern of Jewish people being smeared as mentally disabled and murderers. (Dkt. No. 59-27, ¶¶ 89, 91; Dkt. No. 60-3, ¶¶ 89, 91). Plaintiff also notes that, during the Jewish Passover holiday, a particular employee, Kenneth Iaonne, twice asked him how many children were missing in his neighborhood, which Plaintiff interpreted as invoking the antisemitic concept of "blood libel." (Dkt. No. 59-27, ¶ 96; Dkt. No. 60-3, ¶ 96). However, Plaintiff admits that he does not know his

---

constituted something more than legitimate admonitions from Plaintiff's supervisors for perceived mistakes or misbehavior, the Court does not find that "a reasonable person would find [these incidents] hostile or abusive," and does not consider them in connection with Plaintiff's hostile work environment claim. *Raspardo*, 770 F.3d at 114.

harassers' motivations or whether any of them even knew he was Jewish, and specifically admits that he does not know whether Iaonne knew that it was Passover when he made his comments about missing children in Plaintiff's neighborhood. (Dkt. No. 59-27, ¶¶ 83, 90, 96; Dkt. No. 60-3, ¶¶ 83, 90, 96).[8] Plaintiff has presented no non-speculative evidence that his tormenters, including Iaonne, held any animus toward his Jewish faith, and Plaintiff's own speculation or belief about his harassers' motives, without more, is insufficient to establish the necessary link between his Jewish faith and the harassment he experienced. *See, e.g., Staten v. City of New York*, No. 14-cv-4307, 2015 WL 4461688, at *14, 2015 U.S. Dist. LEXIS 94634, at *36 (S.D.N.Y. July 20, 2015) (dismissing hostile work environment claim where, "aside from his own speculation, Plaintiff offers nothing to suggest that any of [the alleged hostile behavior was] based on some discriminatory motive" and collecting case law reaching similar conclusions); *Sealy v. Hertz Corp.*, 688 F. Supp. 2d 247, 258 (S.D.N.Y. 2009) ("Plaintiff's speculation about his supervisors' motives cannot substitute for evidence of conduct manifesting [discriminatory] animus on the part of Hertz's employees"); *cf. Little v. New York*, 96-cv-5132, 1998 WL 306545 at *6, 1998 U.S. Dist. LEXIS 21797, at *16 (E.D.N.Y. June 8, 1998) ("It is well settled that a plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn.").

---

[8] Even assuming, for purposes of summary judgment, that it would be reasonable to infer that Iaonne's particular comments during Passover were tied to Plaintiff's Jewish religion, these isolated comments by a single employee are insufficient to establish the type of severe and pervasive harassment necessary to prevail on a hostile work environment claim. *See Agosto v. New York City Dep't. of Ed.*, 982 F.3d 86, 103 (2d Cir. 2020) ("Although a single incident can create a hostile work environment, the incident must have been 'extraordinarily severe' and therefore this standard is reserved only for the most egregious conduct."); *Sealy v. State Univ. of New York at Stony Brook*, 834 F. App'x 611, 615-16 (2d Cir. 2020) (agreeing with the District Court's judgment that an "isolated incident" that "plainly qualifies as discriminatory conduct," "although reprehensible," does not establish that the plaintiff's "workplace [was] permeated with discriminatory intimidation, ridicule and insult that [was] sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create and abusive working environment" (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 320-21 (2d Cir. 2015))).

Because, on this record, no reasonable jury could find that the harassment Plaintiff experienced while employed at the Selkirk Facility was on account of his Jewish identity, the Court grants Defendant's motion for summary judgment on his hostile work environment claim under Title VII, and need not reach Defendant's alternative argument that the harassment Plaintiff experienced cannot be imputed to Defendant.

### C.    Discrimination Based on Religion (First Cause of Action)

Plaintiff brings a claim for religious discrimination[9] under Title VII (First Cause of Action), on the grounds that Defendant unlawfully decided not to qualify him for permanent employment because of his Jewish faith. (Dkt. No. 9, at 13, 15-16). Under Title VII, "[i]t is unlawful for an employer . . . to fail or refuse to hire or to discharge any individual . . . because of such individual's . . . religion," with "[t]he word 'religion' . . . defined to 'includ[e] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to' a 'religious observance or practice without undue hardship on the conduct of the employer's business.'" *E.E.O.C. v. Ambercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771-72 (2015) (quoting 42 U.S.C. §§ 2000e-2(a), 2000e(j)). Therefore, an employer's refusal to hire a prospective employee because of a desire to avoid accommodating the individual's religious practice gives rise to a cognizable disparate treatment discrimination claim under Title VII. *See Ambercrombie & Fitch*, 575 U.S. at 771-75 & n.2 (explaining that "the 'disparate treatment' (or 'intentional discrimination') provision and the 'disparate impact' provision . . . are the only causes of action under Title VII," and that an employer's refusal to hire an applicant because of a desire not to accommodate the applicant's religious practice is the

---

[9] Because § 1981 does not apply to religion-based discrimination claims, it applies only to the extent his Jewish identity is conceptualized as a race. *See Kampfer*, 2011 WL 691647, at *2, 2011 U.S. Dist. LEXIS 16586, at *6. The Court thus analyzes Plaintiff's religion-based discrimination claim only under Title VII, and addresses Plaintiff's race-based discrimination claims under Title VII and § 1981 separately below. *See* Section IV.D *infra*.

former, because "[f]ailing to hire for that reason is *synonymous* with refusing to accommodate the religious practice. To accuse the employer of the one is to accuse him of the other.").[10]

Discrimination claims under Title VII are analyzed under the three-part *McDonnell Douglas*[11] burden-shifting framework. *See Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) ("The Title VII . . . discrimination claims are governed at the summary judgment stage by the burden-shifting analysis first established in *McDonnell Douglas Corp. v. Green*."). Under this burden-shifting framework, Plaintiff must first establish a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he was qualified for the position at issue; (3) he was denied the position; and (4) the circumstances of that decision give rise to an inference of unlawful discrimination. *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010). Plaintiff's burden of proof is *de minimis* at this stage. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). If the plaintiff succeeds in showing a prima facie case of discrimination, a presumption of discrimination arises, and the burden shifts to the defendant to demonstrate some legitimate, non-discriminatory reason for the adverse action. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Ruiz*, 609 F.3d at 492. If the defendant provides such a reason,

---

[10] While the parties brief Plaintiff's failure-to-accommodate-religion claim as if it were distinct from and additional to Plaintiff's more general disparate treatment discrimination claim, the Supreme Court in *Ambercrombie* made clear that failure to accommodate religion is not a freestanding, independent claim under Title VII, but is simply one theory by which a claim of disparate treatment discrimination on the basis of religion may be proven. *See Ambercrombie & Fitch*, 575 U.S. at 771 ("[T]he 'disparate treatment' (or 'intentional discrimination') provision and the 'disparate impact' provision . . . are the only causes of action under Title VII."); *id.* at 780-81, 789 (Thomas, J. concurring in part and dissenting in part) ("I agree with the Court that there are two—and only two—causes of action under Title VII of the Civil Rights Act of 1964 as understood by our precedents: a disparate-treatment (or intentional-discrimination) claim and a disparate-impact claim . . . The Court today rightly puts to rest the notion that Title VII creates a freestanding religious-accommodation claim."). Moreover, on this record, the only religious discrimination theory on which Plaintiff could possibly prevail is a failure-to-accommodate theory based on Defendant's response to his indication that he would seek religious accommodations after being qualified for permanent employment. There is no record evidence from which a reasonable jury could find for Plaintiff on any other religious discrimination theory, for example, that Defendant discriminated against Plaintiff because of animus toward the Jewish religion generally, as distinct from a desire not to accommodate Plaintiff's religious practice. Therefore, the Court analyzes Plaintiff's religious discrimination claim as a single claim based on a failure-to-accommodate theory.

[11] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).

the presumption of discrimination created by the prima facie case drops out of the analysis, and the burden shifts back to the plaintiff, who must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock*, 224 F.3d at 42; *see also Kwan v. Andalex Grp., LLC,* 737 F.3d 834, 845 (2d Cir. 2013). Defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

To prove a discrimination claim under Title VII, "[s]o-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013). Thus, where, as here, the plaintiff claims that an employer refused to hire him because of his need for a religious accommodation, the rule is that "[a]n employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions," so if "the employer's desire to avoid the prospective accommodation is a motivating factor in his decision, the employer violates Title VII." *Ambercrombie & Fitch*, 575 U.S. at 773-74; *see also Lowman v. NVI LLC*, 821 F. App'x 29, 31 (2d Cir. 2020) ("In a case involving alleged religious discrimination, a plaintiff may satisfy [their prima facie] burden [at the motion to dismiss stage] by plausibly alleging that he or she 'actually requires an accommodation of [his or her] religious practice' and that 'the employer's desire to avoid the prospective accommodation [was] a motivating factor in [an employment] decision.'" (quoting *Ambercrombie & Fitch*, 575 U.S. at 773-74)). The plaintiff need not show that the employer "had 'actual knowledge' of the applicant's need for an accommodation" so long as the applicant's "need for an accommodation was a motivating factor

in the employer's decision." *Ambercrombie & Fitch*, 575 U.S. at 772; *see also id.* at 773-74

("[S]uppose that an employer thinks (though he does not know for certain) that a job applicant

may be an orthodox Jew who will observe the Sabbath, and thus be unable to work on Saturdays.

If the applicant actually requires an accommodation of that religious practice, and the employer's

desire to avoid the prospective accommodation is a motivating factor in his decision, the

employer violates Title VII.").

Turning first to Plaintiff's prima facie case, Defendant does not appear to dispute that

Plaintiff is a member of a protected class (the Jewish religion), that he was qualified for the

utility worker position, or that Defendant's April 26, 2017 decision not to qualify him for

permanent employment constitutes an adverse employment action. However, Defendant argues

that Plaintiff has failed to show any causal connection between Plaintiff's Jewish faith and

Defendant's decision not to qualify him for permanent employment. (Dkt. No. 59-28, at 18).

Defendant argues that Plaintiff "cannot show that anyone at [the Selkirk Facility] was

motivated to discriminate against [Plaintiff] based on religion, because there is no evidence

anyone *even knew* he is Jewish." (*Id.*). Plaintiff admits that he cannot say with certainty whether

anyone at the Selkirk Facility knew of his Jewish faith. (Dkt. No. 59-27, ¶ 90; Dkt. No. 60-3, ¶

90). He did not specifically tell anyone at the Selkirk Facility that he was Jewish, and Gibson

apparently denies that he was aware of Plaintiff's religion. (Dkt. No. 59-17, at 6). However,

Plaintiff testified that, during his training and probationary period, he raised questions about the

possibility of obtaining a religious exemption from Saturday work with four different

individuals—two trainers in Atlanta, the Selkirk Facility's Training Coordinator John Goca, and

the Selkirk Facility's Operations Manager Derrick Gibson[12]—all of whom reacted negatively.[13] (Dkt. No. 59-27, ¶¶ 46, 124-26, 128-29; Dkt. No. 60-3, ¶¶ 46, 124-26, 128-29; Dkt. No. 59-11, at 3-4). Three of these individuals (the Atlanta trainers and Goca) had no involvement in the decision not to qualify Plaintiff, and there is no evidence that they ever conveyed Plaintiff's inquiries to those that did. (Dkt. No. 59-27, ¶¶ 47, 132; Dkt. No. 60-3, ¶¶ 47, 132; Dkt. No. 59-11, at 3). However, the remaining individual, Gibson, was not only on the Selkirk Facility's management team, but personally recommended that Plaintiff not be hired on a permanent basis. (Dkt. No. 59-27, ¶ 130; Dkt. No. 59-26, at 5).

Construing the record in the light most favorable to Plaintiff, a fact-finder could conclude that Plaintiff's inquiries regarding Defendant's accommodations for Saturday religious observances—a practice commonly (though not exclusively) associated with the Jewish community—would have alerted these individuals, and particularly Gibson, to Plaintiff's Jewish identity. But even assuming Gibson was unaware that Plaintiff was Jewish, to the extent Plaintiff raised questions about religious accommodations with Gibson, and the desire to avoid granting any such religious accommodation was a motivating factor in Defendant's decision not to hire him, Plaintiff has a valid claim for discrimination on the basis of his religious practice, regardless of whether or not Gibson or anyone else employed by Defendant had actual knowledge of what Plaintiff's specific creed was. *Ambercrombie & Fitch*, 575 U.S. at 72 (finding that, for purposes

---

[12] In his deposition testimony, Goca denied that Plaintiff ever indicated to him that he would be asking for a religious accommodation, and in a submission to the NYSDHR, Defendant represented that Gibson denied that Plaintiff ever requested a weekend off. (Dkt. No. 59-27, ¶ 127; Dkt. No. 60-3, ¶ 127). However, for purposes of summary judgment, the Court must construe the record in the light most favorable to Plaintiff.

[13] Specifically, the Atlanta trainers advised him to discuss that issue with the management team at the Selkirk Facility, but also warned him "not to make waves" during his probationary period, (Dkt. No. 59-27, ¶ 46; Dkt. No. 60-3, ¶ 46; Dkt. No. 59-11, at 3); Gibson told him that others who have worked much longer still have not had a weekend day off, (Dkt. No. 59-27, ¶¶ 128-29; Dkt. No. 60-3, ¶¶ 128-29; Dkt. No. 59-11, at 4); and Goca told him that "[w]e have people around here who have been working for five to ten years without a weekend day off," and that "[y]ou might get stuck working weekends for five to ten years," (Dkt. No. 59-27, ¶ 126; Dkt. No. 60-3, ¶ 126).

of a Title VII failure to accommodate claim, a rejected applicant need not show that an employer "had 'actual knowledge' of the applicant's need for an accommodation" so long as the applicant's "need for an accommodation was a motivating factor in the employer's decision.").

In addition to the somewhat hostile reactions by Gibson and others to Plaintiff's indication that he may request a religious accommodation in the future, Defendant's own records and Goca's deposition testimony demonstrate that Plaintiff was the only trainee who failed to qualify in his class; was one of only two utility worker trainees who failed to qualify between January 1, 2016 and April 26, 2017; and was one of only a small handful (five or six out of approximately 50) who failed to qualify during Goca's six-to-eight-year tenure as a union secretary. (Dkt. No. 59-27, ¶ 151; Dkt. No. 60-3, ¶ 151, Dkt. No. 59-22, at 12). Given Plaintiff's *de minimis* burden at this step of the burden-shifting framework, and the "mixed motivation" causation standard applicable to his religious discrimination claim, the record evidence is sufficient—but barely sufficient—to establish Plaintiff's prima facie case.

Turning to the second prong of the *McDonnell Douglas* analysis, Defendant has clearly met its burden of proffering a legitimate, non-discriminatory reason for Plaintiff's firing. Specifically, Defendant has presented Plaintiff's lack of comprehension of his job duties, unsafe workplace behavior, and lack of motivation or urgency as reasons for his failure to qualify as a full-time employee. (Dkt. No. 59-26, at 4-5 (affidavit from Defendant's Senior Manager of Employee Relations explaining that Plaintiff failed to qualify because the Selkirk Facility's management team "noticed that [Plaintiff] showed a lack of comprehension of what the job entailed," and "had a hard time grasping concepts like where he was supposed to be when locomotives moved through the facility"; "received reports from [Plaintiff's] trainers about him not being a safe employee"; "was aware of at least one occasion where [Plaintiff] walked across

32

a track with a moving locomotive, presenting a substantial safety concern"; and "noticed that [Plaintiff's] attitude towards learning the job was substandard, as reflected in the way he communicated and walked, and he appeared to lack a sense of urgency");[14] Dkt. No. 59-21, at 2 (email from Shift Plant Superintendent to Gibson, which was then forwarded to the management team, stating that "in the few days that [Plaintiff] has been a trainee on my shift I can easily say that I am not impressed with his motivation and overall ability to grasp the job at hand.")).

Thus, the burden shifts back to Plaintiff to establish that these legitimate reasons were merely a pretext for unlawful discrimination. Here, as with Plaintiff's prima facie case, while the evidence in Plaintiff's favor is weak, he has presented just barely enough evidence of pretext to survive summary judgment. First, Plaintiff has presented some evidence of shifting explanations for the hiring decision. When Plaintiff's probationary period ended, Defendant initially provided no reasons for its decision not to qualify him, and told Plaintiff only that he had been "rejected." (Dkt. No. 59-23, at 2). According to Plaintiff, when he subsequently spoke with Goca about his failure to qualify, Goca first expressed "total shock" and stated he "had no idea why [Plaintiff] was being terminated," but then said that Plaintiff "was not a good fit," that "the managers had gotten together and stated that [Plaintiff] lacked motivation and interest in the job," and that the Selkirk Facility "was not a fair place" and "certain people just didn't belong." (Dkt. No. 59-11, at 5). Plaintiff claims that Goca also told him that his termination "had nothing to do with [his] job performance." (Dkt. No. 9, at 12). Notably, in his deposition, Goca testified that during Plaintiff's probationary period, he received feedback on Plaintiff's progress that was positive "[f]or the most part," that Plaintiff was "a good worker" who never refused direction, that he was

---

[14] The affidavit also references the fact that Plaintiff was two hours late to work on one day and absent from work without permission on another, but does not list those among the factors motivating Defendant's decision not to hire him. (Dkt. No. 59-26, at 4-5).

the type to be attentive to his job, and that the negative feedback he received from Plaintiff's peer trainers was simply that Plaintiff "wasn't a good fit." (Dkt. No. 59-4, at 12-13). While Goca was not directly involved in Defendant's hiring decision, the record contains no testimony or other direct, firsthand evidence from those who were involved in that decision regarding their motivations. Rather, the earliest record evidence containing specific explanations of Defendant's reasons for rejecting Plaintiff's application, such as safety concerns and lack of motivation, is the letter briefing that Beth Nettles, the Director of Employee Relations, submitted to the NYSDHR during its investigation of Plaintiff's EEOC Complaint. (Dkt. Nos. 59-17, 59-22).

Goca's shock and confusion over why Plaintiff was not hired full-time, combined with his initial vague explanations about motivation and interest and assurances that the decision was unrelated to Plaintiff's job performance, followed by Defendant's post-EEOC Complaint addition of specific concerns that are arguably inconsistent with Goca's own firsthand recollection of Plaintiff's performance, collectively constitute some evidence of shifting explanations, which (at least for summary judgment purposes) supports Plaintiff's argument that Defendant's explanations are pretextual. *See, e.g., Zann Kwan*, 737 F.3d at 846-47 (finding triable issue of fact as to pretext in part based on the defendant's "shifting and somewhat inconsistent explanations for [the plaintiff's] termination"); *Lent v. Goldman Sachs & Co.*, No. 97-cv-9413, 1998 WL 915906, at *6, 1998 U.S. Dist. LEXIS 20371, at *18-19 ("The Second Circuit has held that discrepancies in defendant's stated reasons for termination may be evidence of pretext." (citing *Schmitz v. St. Regis Paper Co.*, 811 F.2d 131, 133 (2d Cir. 1987) & *EEOC v. Ethan Allen*, 44 F.3d 116, 120 (2d Cir. 1994))).

Plaintiff also argues that the fact that "[o]ther trainees were not scrutinized or terminated because of their evolving performance within this initial training period" at the Selkirk Facility

34

supports his contention that Defendant's work-performance-related explanations for not qualifying Plaintiff are pretextual. (Dkt. No. 60, at 13). Plaintiff argues that Defendant "only failed to accept approximately half a dozen employee applications within six to eight years, including [Plaintiff's] application" while accepting "approximately 50 employee applications in that same timeframe" despite the fact that Defendant "had experienced strong fluctuations in errors resulting in derailments at the Selkirk yard, including nine recorded derailments in one year." (*Id.* at 15). Plaintiff posits that Defendant's refusal to qualify Plaintiff "[d]espite acceptance of applicants who did cause derailments" demonstrates that "Defendant did not primarily deny Mr. Privler based upon his alleged performance deficiencies, but rather denied him based upon his mention of religious accommodations." (*Id.*).

However, Plaintiff's generalized speculation that, given its relatively low rejection rate and high rate of derailments, Defendant *must* have hired other utility worker trainees with performance problems is insufficient to establish pretext. Rather, Plaintiff must support his argument with specific, non-conclusory evidence that "the individuals with whom plaintiff compares himself '[are] similarly situated in all material respects,'" including that they were "subject to the same performance evaluation and discipline standards [and] that similarly situated employees who went undisciplined engaged in comparable conduct." *Hogan v. State of Conn. Judicial Branch*, 220 F. Supp. 2d 111, 119 (D. Conn. 2002) (first quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997); and then quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)). Here, the only comparator for whom Plaintiff has presented any evidence is Julio Ocasio, who was a fellow utility worker trainee during Plaintiff's training and probationary period, and whom Defendant ultimately hired. According to Plaintiff, Julio "struggled through the [Atlanta] training" and was "close to be[ing] asked to leave the program"

before Plaintiff "assisted [him] in passing his exams," (Dkt. No. 59-11, at 3); at the Selkirk

Facility, Julio "missed an entire day due to a snowstorm" but was not reprimanded by Gibson, in

contrast to Plaintiff, who was reprimanded harshly after arriving only two hours late due to a

snowstorm, (Dkt. No. 59-7, at 22-23); and a peer trainer, Raymond McClaussin, told Plaintiff on

"several different occasions" toward the end of Plaintiff's probationary period that Defendant's

"management had the intent on being markedly or much harder on [Plaintiff], in terms of

treatment of the upcoming qualification, than would be applied to" Julio, smirking and refusing

to answer when Plaintiff asked him why, (*id.* at 47-48).

Standing alone, the comparative evidence Plaintiff presents is scant and insufficient to

establish the disparate treatment necessary for pretext. Aside from a single anecdote regarding

absenteeism and tardiness, Plaintiff has not presented any testimony or evidence that there was a

"reasonably close resemblance" between Julio's performance at the Selkirk Facility (as distinct

from the preliminary training in Atlanta) and Plaintiff's. *Hogan*, 220 F. Supp. 2d at 119 (quoting

*Graham*, 230 F.3d at 40). At the same time, Plaintiff's testimony that a peer trainer explicitly

told him that Defendant's management team intended to subject Plaintiff to a higher standard

than Julio, while refusing to provide any explanation or justification, at least raises questions

about whether Defendant unjustifiably held Plaintiff to a higher standard than similarly situated

trainees who did not request religious accommodations.

Moreover, turning to Defendant's own evidence, Defendant's primary support for its

contentions (aside from its own submissions to the NYSDHR, (Dkt. Nos. 59-17, 59-22), which

obviously post-date Plaintiff's filing of the EEOC Complaint) consist of: (1) an affidavit from its

Senior Manager of Employee Relations that was prepared for purposes of this litigation (and was

based on a review of notes from internal interviews rather than direct, firsthand knowledge of

Plaintiff's work performance), (the "Charron Affidavit"), (Dkt. No. 59-26); and (2) a single contemporaneous email from a Shift Plant Superintendent expressing concern about Plaintiff's motivation and performance, (Dkt. No. 59-21). Neither party has presented direct testimony from individuals who were actually involved in the decision not to qualify Plaintiff, and neither of Defendant's two employees whose deposition testimony is in the record—John Goca and Richard Losee—gave testimony that clearly, unambiguously supports Defendant's explanation for that decision. In fact, as described above, Goca gave testimony that at least arguably contradicts that explanation. (Dkt. No. 59-4, at 12-13).

Viewing all this collectively, the record presents just enough "inconsistencies" and "contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action" for the Court to find sufficient evidence of pretext for summary judgment purposes. *Palencar*, 834 F. App'x at 651 (quoting *Zann Kwan*, 737 F.3d at 846). And despite the relatively weak record support for Plaintiff's claim that he was discriminated against, given the questions the record raises regarding the true reasons for Defendant's hiring decision and Plaintiff's description of Defendant's hostility toward his inquiries regarding religious accommodations, the record evidence is sufficient, if barely sufficient, to present a triable issue of fact regarding whether Defendant's suspicion, concern or belief that Plaintiff would require a religious accommodation, and its desire to avoid providing that accommodation, was a motivating factor in its decision not to hire him on a permanent basis.

This does not end the Court's inquiry, however. Because Plaintiff's religious discrimination claim is based on Defendant's alleged refusal to accommodate his religious practice, Defendant may escape liability if it can "show that it made good faith efforts to provide the employee with a reasonable accommodation or that providing such an accommodation would

cause undue hardship to the employer's business." *Elmenayer v. ABF Freight Sys.,* No. 98-cv-4061, 2001 WL 1152815, at *5, 2001 U.S. Dist. LEXIS 15357, at *14 (E.D.N.Y. Sept. 20, 2001); *see also Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006) (explaining that if a plaintiff establishes a prima facie case, "the employer 'must offer [him or her] a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship'" (quoting *Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002))). As the Supreme Court established in the landmark case of *Trans World Airlines, Inc. v. Hardison*, "[a]n accommodation is said to cause an undue hardship whenever it results in 'more than a de minimis cost' to the employer." *Baker*, 445 F.3d at 548 (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)).[15]

Here, Defendant posits its need for utility workers on a 24/7 basis, the CBA's seniority-based system for assigning weekend shifts, and the impact on employee morale of granting brand new employees like Plaintiff religious exemptions from Saturday work as reasons why accommodating Plaintiff's religious practice would constitute an undue burden. (Dkt. No. 59-27, ¶¶ 9-19; Dkt. No. 60-3, ¶¶ 9-19; Dkt. No. 59-28, at 21-22). Courts disagree on whether such reasons are sufficient to meet a defendant's burden of proving, *as a matter of law at the summary judgment stage*, that accommodating an employee's religious practice would be unduly burdensome, particularly where, as here, there is no evidence that the employer made any attempt to work with its employees' union to consider whether a reasonable accommodation could be made consistent with the terms of a CBA. *Compare, e.g., Sides v. NYS Div. of State*

---

[15] It is worth noting that several justices of the Supreme Court have recently expressed skepticism regarding *Hardison*'s "de minimis cost" test, and have strongly indicated a preference for revisiting, and possibly overturning, that aspect of *Hardison*. *See, e.g., Small v. Memphis Light, Gas & Water*, 141 S. Ct. 1227, 1228-29 (2021); *Patterson v. Walgreen Co.*, 140 S. Ct. 685, 685-86 (2020). Nonetheless, at this time, the *Hardison* test, and the Second Circuit jurisprudence applying it, remains binding on this Court.

*Police*, No. 03-cv-153, 2005 WL 1523557, at *2-6, 2005 U.S. Dist. LEXIS 12635, at *6-18 (N.D.N.Y. 2005), *with, e.g., Jamil v. Sessions*, No. 14-cv-2355, 2017 WL 913601, at *12-18, 2017 U.S. Dist. LEXIS 31815, at *30-47 (E.D.N.Y. Mar. 6, 2017). At this stage, where "we have only [the employer's] assertions about the constraints of the CBA" as opposed to a "fully developed" record. *Id.* at *13 n.26, 2017 U.S. Dist. LEXIS 31815, at *35 n. 26 (citations and internal quotation marks omitted), the Court finds that the question of whether Defendant could have reasonably accommodated Plaintiff's religious needs without incurring an undue burden to be best saved for trial, to the extent Defendant continues to assert such a defense at that stage. Therefore, the Court denies Defendant's motion for summary judgment on Plaintiff's religious discrimination claim to the extent that claim is based on a failure-to-accommodate theory (First Cause of Action).

> ### D.   Discrimination Based on Race (First and Fourth Causes of Action)

Plaintiff brings claims for race discrimination under Title VII (First Cause of Action) and § 1981 (Fourth Cause of Action), on the grounds that Defendant unlawfully decided not to qualify him for permanent employment because of his Jewish race. (Dkt. No. 9, at 13, 15-16). Title VII establishes that it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Section 1981 establishes that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981 therefore "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment . . . and is applicable to a plaintiff complaining of discrimination during an employment period of probation." *Patterson v. County of Oneida*, 375

F.3d 206, 224-25 (2d Cir. 2004). Claims for racial discrimination under § 1981 and Title VII are analyzed under the same three-part *McDonnell Douglas* burden-shifting framework described above in connection with Plaintiff's religious discrimination claim. *See Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) ("The Title VII [and] § 1981 . . . discrimination claims are governed at the summary judgment stage by the burden-shifting analysis first established in *McDonnell Douglas Corp. v. Green*."); *see also* Section IV.C *supra* (explaining *McDonnell Douglas* burden-shifting framework). However, while Title VII claims apply a "mixed motivation" causation standard, *id.*, to prove a discrimination claim under § 1981, a Plaintiff must establish "but-for" causation, i.e. "that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

As discussed in connection with Plaintiff's religious discrimination claim, at the very most, the record raises a triable issue of fact as to whether Defendant's decision not to hire Plaintiff permanently was motivated by a desire to avoid accommodating his *religious practice*, as distinct from animosity toward his Jewish racial identity. There is no evidence in the record that anyone with decision-making authority over Plaintiff's hiring ever expressed animus or ill-will toward Plaintiff's Jewish identity or the Jewish people as a race. Nor is there any other direct or circumstantial evidence from which a fact-finder could reasonably infer that Plaintiff's Jewish race (as distinct from his religious practice of observing the Sabbath) was a motivating factor in (as required under Title VII) or a but-for cause of (as required under § 1981) Defendant's decision not to hire him. Therefore, Plaintiff's race-based discrimination claims under both Title VII and § 1981 must be dismissed.

E.        **Retaliation Claims (Second and Fifth Causes of Action)**

Plaintiff brings retaliation claims under Title VII (Second Cause of Action) and § 1981

(Fifth Cause of Action). (Dkt. No. 9, at 13-15, 17). "Retaliation claims under Title VII and §

1981 are both analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-

shifting evidentiary framework." *Littlejohn*, 795 F.3d at 315; *see also Fincher v. Depository*

*Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) ("Retaliation claims made under 42

U.S.C. § 1981, like those made under Title VII, are evaluated using a three-step burden-shifting

analysis."). In the first step, the plaintiff must establish a prima facie case of retaliation by

showing: "1) participation in a protected activity; 2) the defendant's knowledge of the protected

activity; 3) an adverse employment action; and 4) a causal connection between the protected

activity and the adverse employment action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834,

844 (2d Cir. 2013) (internal quotation marks and citation omitted). "The plaintiff's burden of

proof as to this first step 'has been characterized as 'minimal' and '*de minimis.*''" *Id.* (citation

omitted).

Under both Title VII and § 1981, to prevail on a retaliation claim, the plaintiff must

demonstrate that the employer's retaliatory motive was a but-for cause of the challenged

employment action. *See Palencar v. New York Power Auth.*, 834 F. App'x 647, 651 (2d Cir.

2020) (citing *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015)); *Knight v.*

*Nassau Cty.*, No. 20-cv-2760, 2021 WL 2817006, at *2, 2021 U.S. App. LEXIS 20063, at *3 (2d

Cir. July 7, 2021). However, even under a but-for standard, "[c]ausation can be proven (1)

directly 'through evidence of retaliatory animus directed against the plaintiff by the defendant';

or (2) indirectly either (a) 'by showing that the protected activity was followed closely by

discriminatory treatment,' or (b) 'through other circumstantial evidence such as disparate

treatment of fellow employees who engaged in similar conduct.'" *D'Andrea v. Nielsen*, 765 F.

App'x 602, 605 (2d Cir. 2019) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d

Cir. 2000)); *see also Zann Kwan*, 737 F.3d at 845 ("[T]he but-for causation standard does not

alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary

judgment or at trial indirectly through temporal proximity.").

"Once the plaintiff has established a prima facie showing of retaliation, the burden shifts

to the employer to articulate some legitimate, non-retaliatory reason for the employment action."

*Id*. If the employer does so, "the presumption of retaliation arising from the establishment of the

prima facie case drops from the picture," and the plaintiff must come forward with evidence that

"the non-retaliatory reason is a mere pretext for retaliation." *Id.* The plaintiff can meet this

burden "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the

employer's proffered legitimate, nonretaliatory reasons for its action." *Palencar*, 834 F. App'x at

651 (quoting *Zann Kwan*, 737 F.3d at 846).

Plaintiff alleges that Defendant chose not to qualify him for permanent employment as

retaliation for engaging in the following protected activity: (1) Plaintiff's inquiries regarding the

possibility of obtaining a religious accommodation;[16] and (2) Plaintiff's reporting of the

harassment he experienced at the Selkirk Facility. Defendant concedes that its April 26, 2017

decision not to qualify Plaintiff for permanent employment constitutes an adverse employment

action. (Dkt. No. 59-28, at 30). However, Defendant argues Plaintiff has failed to make out the

---

[16] Plaintiff's complaint does not explicitly include the allegations regarding his inquiries about religious accommodations in its description of his retaliation causes of action or allege that the inquiries were a protected activity, (Dkt. No. 9, at 13-15, 17), but Plaintiff did make clear during the discovery process that he was asserting a retaliation claim based on the inquiries, (Dkt. No. 59-19, at 23), and the parties have addressed such a claim in their summary judgment briefing, (Dkt. No. 59-28, at 29-31; Dkt. No. 60, at 19-20). The Court therefore considers this claim. *See Quinones v. City of Binghamton*, 997 F.3d 461, 468-69 (2d Cir. 2021) (finding that a District Court committed reversible error when it "declined to consider [Plaintiff's] discrimination claim because it was not 'enumerated in the complaint" where the complaint's factual allegations "sufficiently 'informed [Defendants] of the factual basis for' a discrimination claim despite [Plaintiff's] failure to enumerate it as a separate cause of action" and where "Defendants' motion to dismiss expressly 'interpreted Plaintiff's complaint to assert [a discrimination claim]' and addressed the merits of that claim at length").

first element (protected activity), second element (Defendant's knowledge of the protected

activity), and fourth element (causal connection) of a prima facie case of retaliation, and further

contends that there were legitimate, nonretaliatory reasons for its actions. (*Id.* at 30-31).

> i. *Retaliation for Plaintiff's Inquiries Regarding a Religious Accommodation*

While the Second Circuit has not expressly determined whether a request for a religious

accommodation constitutes "protected activity" for purposes of a Title VII retaliation claim,

District Courts in this Circuit have held that it does. *See, e.g., Levy v. Legal Aid Soc.*, 408 F.

Supp. 3d 209, 216-17 (E.D.N.Y. 2019) (citing *Jenkins v. N.Y.C. Transit Auth.*, 646 F. Supp. 2d

464, 473 (S.D.N.Y. 2009)); *Chavis v. Wal-Mart Stores, Inc.*, 265 F. Supp. 3d 391, 407 n.6

(S.D.N.Y. 2017) ("Courts in this District have held that a request for a religious accommodation

itself constitutes protected activity for purposes of a Title VII retaliation claim, citing the rule in

this Circuit that requests for disability accommodations are protected activity under the

Americans with Disabilities Act."). As § 1981 applies only to discrimination based on race, and

not on religion, requesting a religious accommodation cannot constitute protected activity for

purposes of Plaintiff's § 1981 claim. Therefore, by definition, this particular retaliation theory

only applies to Plaintiff's Title VII claim (Second Cause of Action) and not his § 1981 claim

(Fifth Cause of Action).

For purposes of the present motion, Defendant does not appear to contest that requesting

a religious accommodation constitutes "protected activity." Rather, Defendant argues that

Plaintiff cannot demonstrate that he actually requested a religious accommodation from

Defendant. (Dkt. No. 59-28, at 30). As discussed previously, Plaintiff testified that, during his

training and probationary period, he raised questions about the possibility of obtaining a religious

exemption from Saturday work with four different individuals: two trainers in Atlanta, the

Selkirk Facility's Training Coordinator John Goca, and the Selkirk Facility's Operations Manager Derrick Gibson. (Dkt. No. 59-27, ¶¶ 46, 124-26, 128-29; Dkt. No. 60-3, ¶¶ 46, 124-26, 128-29; Dkt. No. 59-11, at 3-4). Neither party has addressed, with citation to legal authority, whether the inquiries Plaintiff made here, as distinct from a formal request for a religious accommodation, could constitute protected activity, but for summary judgment purposes, the Court assumes, without deciding, that they can. Plaintiff has also presented evidence that Defendant knew of this protected activity, as at least one individual with whom he discussed religious accommodations, Gibson, was on the Selkirk Facility's management team and played a role in the decision not to hire him. (Dkt. No. 59-27, ¶ 130; Dkt. No. 59-26, at 5).

With respect to causation, the Court notes that "'[the Second Circuit has] held that the temporal proximity of [protected activity to an adverse employment action] may serve as circumstantial evidence of retaliation,' but [has] not drawn a 'bright line' as to exactly when a temporal relationship supports a finding of a causal relationship." *Hayes v. Dahlke*, 976 F.3d 259, 273 (2d Cir. 2020) (quoting *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001)). Thus, the question of whether such temporal proximity gives rise to an inference of causation depends on the facts and circumstances of a particular case. *Compare Gorman-Bakos.* 252 F.3d at 555 (holding that five months between the protected action and the retaliation supported an inference of a causal connection), *with Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (finding that the passage of three months weighed against finding a causal connection).

Here, based on Plaintiff's own account of events, his conversation with Gibson about religious accommodations occurred in January 2017, at the very beginning of his probationary

period. (Dkt. No. 59-19, at 23; Dkt No. 9, at 6; Dkt. No. 59-11, at 4).[17] Regardless of when precisely the conversation occurred, the longest possible time period that could have elapsed between this conversation and Defendant's decision not to qualify Plaintiff is twelve weeks, the full length of Plaintiff's probationary period. The Second Circuit has found even longer time periods sufficient to establish causation in certain circumstances. *See, e.g., Gorman-Bakos*, 252 F.3d at 555. While in this particular case, the fact that Plaintiff was permitted to complete his full probationary period, despite indicating at the very beginning of that period that he may seek a religious accommodation after being qualified for permanent employment, arguably weighs somewhat against a finding of causation, this is a factual issue for trial. Viewed together with the other evidence of a causal connection discussed in connection with Plaintiff's religious discrimination claim, *see* Section IV.C *supra*, the Court finds that the evidence, while thin, is sufficient to meet Plaintiff's *de minimis* burden at the prima facie stage.

Moreover, for the same reasons the Court found that Plaintiff has made a "barely sufficient" showing of pretext in the context of his religious discrimination claim, the Court similarly finds that he has made a "barely sufficient" showing of pretext for his corresponding retaliation claim. *See* Section IV.C *supra.* The Court recognizes that Plaintiff will face a higher burden in establishing the necessary but-for causation for his retaliation claim than he faces in meeting the "mixed motivation" standard applicable to his religious discrimination claim. Nonetheless, as discussed in connection with Plaintiff's religious discrimination claim, the Court has found triable issues of fact as to true causes of Defendant's decision not to qualify Plaintiff

---

[17] The record evidence suggests that Plaintiff's conversation with Goca about a possible religious accommodation came mere days before Defendant's decision not to qualify him, (Dkt. No. 59-11, at 3), but there is no evidence in the record suggesting that Goca passed Plaintiff's request along to Gibson or anyone else on the Selkirk Facility's management team, and as noted, the parties agree that Goca himself played no role in the decision not to qualify Plaintiff.

and the credibility of its posited legitimate reasons for that decision. Therefore, on the record

before it, the Court cannot conclude as a matter of law that Plaintiff will not be able to establish

the necessary but-for causation at trial. As such, the Court denies Defendant's motion for

summary judgment on Plaintiff's retaliation claim to the extent it is based on his alleged

inquiries regarding religious accommodations.

> ii.     *Retaliation for Plaintiff's Reporting of the Harassment he Experienced*

Plaintiff also alleges that Defendant retaliated against him for reporting the harassment

and bullying his colleagues subjected him to. "A plaintiff engages in 'protected activity' when

she (1) opposes employment practices prohibited under Title VII; (2) makes a charge of

discrimination; or (3) participates in an investigation, proceeding or hearing arising under Title

VII." *Ramirez v. Michael Cetta Inc.*, No. 19-cv-986, 2020 WL 5819551, at *19, 2020 U.S. Dist.

LEXIS 180619, at *57 (S.D.N.Y. Sept. 30, 2020) (quoting *Bundschuh v. Inn on the Lake Hudson

Hotels, LLC*, 914 F. Supp. 2d 395, 405 (W.D.N.Y. 2012)). This definition of "protected activity"

is the same under § 1981 and Title VII. *See Littlejohn*, 795 F.3d at 316-319 (analyzing whether

employee engaged in "protected activity" for purposes of both Title VII and § 1981 claims by

determining whether her conduct constituted "protected activity" within Title VII's definition).

"[C]omplaints centered on general allegations of harassment unrelated to race [ ] are not

protected activity under Title VII," *Thomas v. iStar Fin.*, 438 F. Supp. 2d 348, 365 (S.D.N.Y.

2006).

As the Court has already found when analyzing Plaintiff's hostile work environment

claim, there is no evidence in the record from which a reasonable fact-finder could determine

that the harassment and bullying Plaintiff experienced contained racial or religious overtones.

*See* Section IV.B *supra.* Nonetheless, for purposes of analyzing Plaintiff's related retaliation

claim, the Court assumes, without deciding, that a fact-finder could reasonably conclude that Plaintiff had "a good faith, reasonable belief that [he] was opposing an employment practice made unlawful by Title VII" when he complained about the harassment, despite the fact that his belief was ultimately incorrect. *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.,* 716 F.3d 10, 14 (2d Cir. 2013) (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001)); *see also id.* at 16 (explaining that a "plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as [she] can establish that [she] possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law" (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2000)). However, even assuming that Plaintiff has satisfied the first element of his claim, he has failed to present evidence of the second element, i.e. that Defendant had knowledge of his protected activity.

As an initial matter, it is undisputed that Plaintiff did not report the harassment he was experiencing through the formal, official channels Defendant had established for this purpose, specifically, the Human Resources Department, the toll-free ethics helpline or the ethics website. (Dkt. No. 59-27, ¶¶ 21-25, 120-21; Dkt. No. 60-3, ¶¶ 21-25, 120-21). This is certainly not fatal to Plaintiff's retaliation claim, as "[i]nformal protests of discrimination, such as making complaints to management . . . are recognized forms of protected activity." *Costa v. Sears Home Imp. Prod., Inc.*, 65 F. Supp. 3d 333, 344 (W.D.N.Y. 2014) (quoting *Matima v. Celli,* 228 F.3d 68, 78-79 (2d Cir. 2000) (quotation marks omitted)). The more significant problem is that there is no evidence in the record from which a reasonable jury could find that Defendant otherwise had knowledge of these informal complaints. Plaintiff testified that he complained about the harassment to several peer trainers, utility workers and a fellow trainee, as well as Richard Losee, who was the

Selkirk Facility's Safety Coordinator and a unionized employee with no supervisory or management role. (Dkt. No. 59-27, ¶¶ 107-17; Dkt. No. 60-3, ¶¶ 107-17). Plaintiff does not recall bringing his complaints to anyone on the Selkirk Facility's management team, (Dkt. No. 59-27, ¶¶ 117-19; Dkt. No. 60-3, ¶¶ 117-19), and there is no evidence that he did so, nor is there evidence that any of those individuals otherwise became aware of his concerns.

Of course, it is well-established that "[t]o satisfy [the knowledge] requirement, a plaintiff is not required to show that the individual decision-makers had knowledge of her protected activity; it is sufficient if the corporate entity has been put on notice of plaintiff's complaint of conduct violating Title VII." *Risco v. McHugh*, 868 F. Supp. 2d 75, 112 (S.D.N.Y. 2012) (citing *Gordon*, 232 F.3d at 116). However, in this case—where there is no evidence that Plaintiff brought his complaints to anyone in a management, human resources or equal employment opportunity role, and where there was no formal complaint or proceeding that would have provided Defendant as an entity with the requisite notice—there does not even appear to be a basis to find the "general corporate knowledge" necessary to satisfy this requirement of Plaintiff's claim. *Cf., e.g., id.* (finding that the plaintiff's filing of an informal complaint with her employer's Equal Opportunity Office satisfied the knowledge requirement, even though there was no evidence that the individual decision-makers who allegedly retaliated against the plaintiff were aware of the complaint (citing *Alston v. N.Y. City Transit Auth.*, 14 F.Supp.2d 308, 311 (S.D.N.Y.1998))); *Gordon*, 232 F.3d at 113-14 (noting, in a lawsuit against a board of education, that "[e]ven though there was consistent testimony from [board members] that they personally knew nothing about the [plaintiff's earlier lawsuit for which the board allegedly retaliated against her], there was . . . *no* dispute that the *Board* as a legal entity knew about [the plaintiff's] protected activity," because the Board was a defendant in that prior lawsuit); *Barney v. Consol.*

*Edison Co. of New York*, No. 99-cv-823, 2009 WL 6551494, at *11, 2009 U.S. Dist. LEXIS

127178, at *37-38 (E.D.N.Y. Oct. 1, 2009), *aff'd sub nom. Barney v. Consol. Edison Co. of N.Y.*,

391 F. App'x 993 (2d Cir. 2010) (finding knowledge element satisfied where protected activity

involved written complaints to the plaintiff's direct supervisor and various Human Resources or

Equal Employment Opportunity officials at the defendant company).

Even assuming, however, that Defendant had sufficient notice that Plaintiff was

complaining about harassment generally, there is no evidence from which a reasonable jury

could find that Defendant understood those complaints to relate to unlawful, discriminatory

conduct. "[I]mplicit in the requirement that the employer have been aware of the protected

activity is the requirement that it understood, or could reasonably have understood, that the

plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v.*

*Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). Here, according to Plaintiff's

deposition testimony and interrogatory responses, he told Losee and others that he "did not like

or appreciate being called 'Sling Blade' nor having multiple persons grunt or make obscene

gestures at" him, "did not want to be labeled with derogatory or other demeaning nicknames at

the workplace," and "did not welcome the name-calling and other discriminatory practices that

he was being subjected to at the workplace." (Dkt. No. 59-19, at 24-25; *see also* Dkt. No. 59-7,

at 31, 47-49 (describing the same and similar complaints)). As described by Plaintiff himself,

these generic complaints did not identify Plaintiff's Jewish identity as the basis of the

harassment, nor were they otherwise phrased in such a way as to put the listener on notice that

Plaintiff was complaining about *discriminatory* harassment. *See, e.g., Talwar v. Staten Island*

*Univ. Hosp.*, No. 12-cv-33, 2016 WL 1298969, at *11, 2016 U.S. Dist. LEXIS 43943, at *35-36

(E.D.N.Y. Mar. 31, 2016) ("No reasonable jury could conclude that [the plaintiff's] generic

complaints of unfairness . . . were sufficient to put the Hospital on notice that she was complaining about discrimination."); *Farzan v. Wells Fargo Bank. N.A.*, No. 12-cv-1217, 2013 WL 6231615, at \*29, 2013 U.S. Dist. LEXIS 169743, at \*84-85 (S.D.N.Y. Dec. 2, 2013), *report and recommendation adopted,* 2014 U.S. Dist. LEXIS 38582[18] (S.D.N.Y. Mar. 21, 2014), *aff'd sub nom, Farzan v. Genesis 10*, 619 F. App'x 15 (2d Cir. 2015) (finding that the plaintiff's threat to file a "discrimination complaint" did not adequately put employer on notice that plaintiff was complaining about discrimination because of race); *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308-09 (S.D.N.Y. 2009) ("The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally.").

Therefore, the Court grants Defendant's motion for summary judgment with respect to Plaintiff's retaliation claims under Title VII and § 1981 to the extent they are based on his alleged reporting of harassment. Because this would be the only possible basis for Plaintiff's retaliation claim under § 1981, that claim (Plaintiff's Fifth Cause of Action) must be dismissed in its entirety, leaving Plaintiff with only his Title VII retaliation claim (Plaintiff's Second Cause of Action) based on Defendant's alleged retaliation against him for requesting a religious accommodation.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's Motion for Summary Judgment (Dkt. No. 59) is **GRANTED** as to Plaintiff's claims for discrimination under Title VII based on race (First Cause of Action), retaliation under Title VII based on Plaintiff's reporting of alleged harassment

---

[18] No parallel Westlaw citation available.

(Second Cause of Action), hostile work environment under Title VII (Third Cause of Action), race discrimination under § 1981 (Fourth Cause of Action), retaliation under § 1981 (Fifth Cause of Action), and discrimination, retaliation and hostile work environment under the ADA (Sixth, Seventh and Eighth Causes of Action), and **DENIED** as to Plaintiff's claims for discrimination based on failure to accommodate religion (First Cause of Action) and retaliation under Title VII based on Plaintiff's alleged inquiries regarding religious accommodations (Second Cause of Action); and it is further

**ORDERED** that Plaintiff's claims for discrimination under Title VII based on race (First Cause of Action), retaliation under Title VII based on Plaintiff's reporting of alleged harassment (Second Cause of Action), hostile work environment under Title VII (Third Cause of Action), race discrimination under § 1981 (Fourth Cause of Action), retaliation under § 1981 (Fifth Cause of Action), and discrimination, retaliation and hostile work environment under the ADA (Sixth, Seventh and Eighth Causes of Action) are **DISMISSED with prejudice** in their entirety.

**IT IS SO ORDERED.**

Dated:   August 13, 2021
         Syracuse, New York

Brenda K. Sannes
U.S. District Judge